Good morning, Your Honors. Your Honor, may I please the Court? My name is Victoria Biesman and I represent petitioner in this matter. This case was heard by the AJA in regard to asylum requested on a basis of gender-related persecution. The petitioner in this case is a lesbian from Armenia. The immigration judge had denied petition based on two reasons, the petitioner's demeanor and minor inconsistencies which occur in her testimony. Your Honor, I believe that some of the inconsistencies have been, could have been prevented by simple fact if the immigration judge made an inquiry as to whether contents of the application and declaration have been read to the petitioner in her native Armenian language. This was not done. Moreover, the petitioner's attorney during the immigration proceedings who is no longer alive, Gary Zakian, he speaks a different dialect of Armenian and the declaration has been prepared by his office based on 20 minutes interview over the phone. Mr. Zakian spoke to the petitioner for 40 minutes prior to the marriage trial and there was some problems in communication because of the different dialects. Furthermore, the quality of translations during the actual marriage hearing is an issue because interpreter Ms. Ganizova was at times not comfortable with her own translations and I'm referring to administrative record pages 183, 184 and 193. Simply by looking at Ms. Ganizova's last name, since I'm from that part of the world, I could tell you that she is definitely from Azerbaijan, came with the Soviet passport and as a resident of Azerbaijan, she would speak Armenian, heavily russified. It's a very russified Armenian language. She uses a lot of Russian words and that in turn led to the inconsistencies. Furthermore, I would like to quote Webster dictionary. I am from Russia, actually I'm from Ukraine, so I do myself speak several languages and I could assure you from my own experience that it's very difficult to translate for three and a half hours. I also would like to point to this court that in the criminal proceedings, the defendants usually allow two interpreters per courtroom and they change every 20-25 minutes and I represented defendants in criminal proceedings and this is common practice in both state and federal courts. Nevertheless, in immigration proceedings, the respondent is given one interpreter for three and a half hours at a time, maybe with five minutes break. It's very, very difficult for the interpreter to concentrate for such a long time and that leads in turn to the inconsistencies. Moreover, we have presented the BIA with the plausible explanations of the inconsistencies to which the immigration judge points and based on this court's decision in Dow v. Ashcroft, 361 Federal Circuit at 1194 and 1200 9th Circuit 2004, where reasonable and plausible explanations for the inconsistencies are given, the court should reverse the adverse credibility finding. Further, in regard to the demeanor, this court decision in, pardon me for pronunciation, Arulab Palam v. Ashcroft, 353 Federal Circuit, 679-686-2003, that if the judge makes a demeanor-based negative credibility finding, he must specifically refer to non-credible aspects of the applicant's demeanor and the judge did not do it in this case. Furthermore, I'd like to indicate that in the cases of the sexual assault, the victims of the or inconsistency between credible fear interview, which usually takes 40-45 minutes, and her testimony at the merits did not compromise her or his credibility by failing to describe what had happened to her immediately during the first interview at the credible, I mean at the credible fear interview. Furthermore, I'd like to bring to this court attention that according to the United Nations guidelines on international protection, gender-specific harm can take many forms, and one of them is persecution of gays and lesbians. This petitioner here, she's a lesbian from Armenia. Her partner had in my brief or attached to my brief that we had filed with the BIA. Not only she gave affidavit, she had provided the copy of her passport, which clearly states her name as Anna Kachumyan, which supports the respondent's testimony that such person exists and such person was willing to come forward. I also would like to bring to this court attention the fact that in Armenia, the fact that you are a lesbian or homosexual can be punished by three to five years in state prison. And by sending this petitioner back to Armenia, we simply condemn her to the prison term, because if this woman chooses to practice, it's not her choice, it's her sexual orientation. She cannot change it. She suppressed it, as the IJ pointed, for 35 years, and then at the age of 35, she had finally came out as a lesbian. I don't think that she deserves to be sent back to Armenia to face a jail time, to face a societal harassment, state persecution, simply due to some minor inconsistencies, which has been explained to the best of our ability. And once again, I'd like to emphasize that interpreter in immigration proceedings, it's the only conduit that applicant has to convey her claim. And if she's not provided with the quality translation or interpretation, it has highly negative effect on the presentation of her claim. I'd like to answer, I'm sorry. Do you have any questions? This interpreter, where was this interpreter from? Your Honor, I don't know. I did not represent her during the immigration, but simply by the name, Naira Gani Zava. I mean, anybody who is She definitely came with a Soviet passport. I mean, where was the interpreter from? She was called by, I mean, the interpreter usually requested and provided by the immigration court. I mean, was the interpreter Armenian? She was Armenian, but Where did she come from? Egypt, Lebanon? That's what I'm indicating. Azerbaijan. Oh, Azerbaijan. Yes. And in Azerbaijan, they speak different dialect. It's highly peppered with the Russian terms. And that's why she was uncomfortable, probably herself, with her translation. I missed that. I'm sorry. Okay. Thanks. Okay. All right. We'll hear from the government. May it please the Court, I'm still Aviva Foxter for the respondent. Counsel's testimony here today for Petitioner was very interesting. Unfortunately, none of it is in the record. We don't know anything about the interpreter, where she's from, based on the administrative record. We don't know anything about, we don't know that anything untoward happened with her, the preparation of her asylum application, because that's also not in the record because she never objected to it. Counsel, we have a couple of cases, the names of which escape me at the moment, that talk about the reluctance of witnesses to describe sexual assaults and that the withholding of details initially is not necessarily to be considered inconsistent with the giving of details later. How do those cases apply here? Well, in this case, it wasn't just that she didn't say anything about attempted rapes to the asylum officer, or that they also were not in her, I believe they were not in her asylum application. But during her hearing, when she had to testify about those because she wanted to rely on them, the testimony that she provided was sketchy, inconsistent, and increasingly dramatic as the case unfolded. At first she said that there was one incident during which she was, there was an attempted rape. On cross-examination, all of a sudden there were three or four incidents. And it wasn't, the adverse credibility finding wasn't just based on this sort of evolving story about the alleged attempted rapes. There were inconsistencies about every event that made up her persecution claim. For example, she said that her life changed after she received a threatening phone call. And at first in her written application, the threatening phone call was from neighbors. And all of a sudden during her testimony, no, no, the phone calls are from the police. And at first those phone calls threatened her with bad things. Then the phone call threatened her with arrest. I mean, the story became sort of progressively changing and didn't hold to its core throughout from the time that she first arrived in the United States. Well, that's as it comes out of the mouth of the interpreter. Well, regarding the interpreter. I've had Spanish interpreters in court, two of them. And they'll fight each other over the translation, you know. Well, regarding the interpreter. I've had the experience in the past cases where you get an Armenian from Turkey, translator is from Egypt. And it's like, you know. Well, in this case, interestingly, if you look at the record, the first interpreter was actually dismissed by the immigration judge. Because petitioner's previous attorney said, I don't think this interpreter is from the same place as my client. This interpreter is speaking a different dialect. Can we have a continuance for a new interpreter? And, of course, the immigration judge said absolutely and continued the hearing. And, in fact, her direct testimony was restarted at the continued hearing from the very beginning because the judge wanted to make sure that that was correctly interpreted. There's been no motion to reopen on the ground of ineffective assistance or anything like that? No, nothing. And, in fact, petitioner's counsel during the continued hearing did not object to the interpretation. And he clearly understood, based on his objection at the first testimony, he clearly understood what was going on linguistically in the case. And he obviously was satisfied with the interpretation because he knew that the immigration judge would grant a continuance should there be a problem in the case. Because she previously did it. And that is in the record in this case. In addition, again, she hasn't made any sort of motion to reopen with the board for any ground, which would be the appropriate remedy for an interpretation problem or an ineffective assistance of counsel problem. Neither of those things have been done. She hasn't given the agency the opportunity to redress those problems if, in fact, they do exist in this case, which is, again, the proper way for her to have gone about getting these arguments addressed. In addition, she did submit, as she mentioned, an affidavit to the board. But, of course, the board is an appellate body and cannot consider new evidence in the first instance. Again, if she wanted those affidavits presented, the proper way to do that was to file a motion to reopen, which also wasn't done. And I would note that I took a look at those affidavits, and they, in fact, contradict part of her story. Namely, she claimed that she comes from a family of two daughters. In fact, her parents say that she comes from a family of three daughters. So, again, you start to wonder exactly how useful those affidavits, in fact, would have been, could they have been considered, which, again, they couldn't have been because they were not properly submitted in the proper format. Again, Petitioner's story changed every single time she tried to tell it. And the story changed significantly. For example, the one event that she described in great detail, a beating that she allegedly received by the police, because of her lifestyle, she at that time was allegedly living with her girlfriend, she at first said that the reason that she was beaten was that she wasn't home, she was home alone, I'm sorry, and then she was taken to the hospital by friends. Then she said, well, it stopped because my girlfriend was there. There was this ever-changing story about the context in which all of these things occurred and exactly what occurred to her. These are not minor inconsistencies, but, in fact, these are the only incidents that she described in any detail, and these incidents were never consistently described by Petitioner. And they do go to the heart of the claim because they are her claim. Without these particular incidents that she described, there's really nothing before the court on the asylum claim. It's not that they were minor inconsistencies. They were the only thing that she actually talked about. And in terms of Petitioner's other arguments, she, specifically, she had talked about some kind of humanitarian asylum in her brief. Again, that humanitarian asylum presupposes that she provided a credible claim, at least of past persecution, and she couldn't have done that. If, in fact, what she's asking is some kind of humanitarian deferral, she needs to approach the Department of Homeland Security, not this court, for that type of relief. In addition, at the time of her hearing, she didn't provide any affidavits or testimony from her parents or her sister who were present in the United States at the time of her hearing. They didn't appear telephonically. There was absolutely no participation, and she admitted that they knew and could perhaps corroborate the essence of her claim, and they didn't appear. In addition, her medical reports that she tries to have this court consider are also irrelevant for the purposes of an asylum claim. In this case, should this court decide that the adverse credibility finding is not supported by compelling evidence, then the court should remand to the board under Ventura. Any questions? Thank you. Thank you. Your Honors, in regard to the medical records, the medical records are brought to this issue for the reason that the petitioner at the time was in custody. She was in very bad physical condition. She was not treated properly. She received medical care later, and because they could not control her condition, she was released from custody by the Department of Homeland Security. In regard to the inconsistencies, Your Honors, once again, I believe that there is no It's not a major inconsistency whether she was taken to the hospital by the girlfriend or by the friend. Again, it's a matter of semantics. It's a translation from Armenian into English, and again, we do not know what exactly she stated in Armenian. She claims that she explained that it was a friend. I mean, it's an interchangeable word. Furthermore, in regard to Mr. Zakian's ability to determine the quality of the translation, Mr. Zakian was from Lebanon, and he spoke Western dialect of Armenian. The fact that Ms. Aghanizova was from the Soviet Union, from the former Soviet Union, and that the petitioner from the former Soviet Union led to his belief that it should be similar dialect. However, it is not. In respect to not bringing the claim of ineffective assistance of counsel, as I had mentioned, Mr. Zakian died, and I'm sorry I did not feel that it would be appropriate to bring the claim of inofficial assistance against the dead man. He would not be here to answer or to, you know, provide the letter and, you know, to send to the bar letter of complaint against him. It would not be, in my opinion, appropriate. Once again, I would like to emphasize that those in- How does he spell his name? Mr. Zakian? Zakian. Z-A-K-I-A-N. Z-A-K-I-A-N? Yes, Your Honor. Zakian? Yes. Okay. What's his first name? Gary. H-A-R-R-Y, I believe. Harry? Gary. Harry. What is it? G? His name was Harut in Armenian, H-O-U-R-U-T. But here, what was it? I think it's spelled H-A-R-R-Y. Okay. I have a question on procedure. You, or the government's lawyer, may be a good answer. And that is, right now, are there tapes of your client's testimony in Armenian that were in- the testimony that was interpreted, are there tapes existing that you have access to so that you could take those tapes to some other interpreter who could give an affidavit as to whether they're properly interpreted? I'd like to respond. The problem is that the tapes usually record the translation because the respondent speaks very softly and she sits next to the interpreter. It's not properly recorded. They don't have a quality transcription of the petitioner's statement. The government lawyer says, no, they record all of it. They do record, but once again, Your Honor, it's usually- The mic is set up- Yeah, the mic is set up the way the interpreter- When I did depositions years ago with witnesses who had to have their testimony translated from Japanese, it was set up that way rather than the dual mic. Exactly. That's what the problem is. But has that been attempted? Well, I did attempt to listen to those tapes. I do not speak Armenian, of course, but it's very softly. So it's basically not clear tapes. Okay, and, Your Honors, in regard to the affidavits of the family and the fact that the family did not appear at the hearing, the respondent on the record stated that she did not feel very comfortable to testify in front of, you know, with her family being there because it's not something that is common in Armenia. And again, I don't want to testify, but I have right now a case that originated at Mira Loma where a gay Armenian man was beaten up by the inmates at Mira Loma- Counsel, that's not in the record of this case. I know. I'm sorry. I'm just trying to do my best to defend my client. Mira Loma, huh? Mira Loma, Your Honor. Okay. He was released solely because of that. I mean, it's very deeply, deep in Armenian culture. Yes, we understand that.  Thank you, Your Honor. I will come to the next matter. Rabokov v. Gonzalez.
judges: Pregerson, Graber, Gould